## JAMS EMPLOYMENT ARBITRATION

| | |
|---|---|
| **TIMOTHY G. STAUB** | ) |
| | ) |
| **CLAIMANT,** | ) |
| | ) |
| **v.** | )   **Case No.** |
| | ) |
| **LOCUS MANAGEMENT, LLC** | ) |
| | ) |
| **AND** | ) |
| | ) |
| **LOCUS INGREDIENTS, a wholly owned** | ) |
| **subsidiary of LOCUS SOLUTIONS, LLC** | ) |
| | ) |
| **RESPONDENTS.** | ) |

## ARBITRATION DEMAND

COMES NOW Claimant Timothy G. Staub ("Claimant" or "Staub"), by counsel, and submits this Arbitration Demand against Locus Management, LLC and Locus Ingredients, a wholly owned subsidiary of Locus Solutions, LLC, (collectively "Locus" or "Respondents") for breach of contract. In support thereof, Claimant states as follows:

## INTRODUCTION

1.       Staub brings this action for breach of contract seeking to recover unpaid severance benefits owed to him by Locus, his former employer, arising out of his Employment Agreement and termination from employment Without Cause.

## AGREEMENT TO ARBITRATE

2.       On September 15, 2022, the parties entered into an Employment Agreement, which contains a Consent to Arbitrate clause specifying arbitration, in accordance with JAMS Employment Arbitration Rules & Procedures, for all claims arising out of or relating to Staub's employment and termination from employment. *See* Exhibit A at paragraph 17. The Employment

Ex. 1

Agreement was a required condition of employment, and the arbitration clause was "[i]n consideration of [Locus] employing [Staub] and the wages and benefits provided in this Agreement..." *Id*.

## PARTIES

3.      Staub is a Virginia resident and the former CEO of Locus Ingredients, a wholly owned subsidiary of Locus Solutions, LLC, and former employee of Locus Management, LLC. Staub worked for Locus from their Richmond, Virginia location until his involuntary termination from employment Without Cause on October 13, 2023.

4.      Locus Management, LLC is a Solon, Ohio based company that, on information and belief, operates as the primary W-2 employer of the employees working for the various Locus Solutions, LLC subsidiary companies.

5.      Locus Ingredients is a division and/or wholly owned subsidiary of Locus Solutions, LLC that develops biobased biosurfactant ingredients. Locus Ingredients operated a lab in Richmond, Virginia until its October 13, 2023, closure.

## FACTUAL BACKGROUND

6.      Staub first began working with Locus in or about August 2019 in a consulting capacity.

7.      In May 2021, Staub and Locus entered into an Employment Agreement pursuant to which Staub was the CEO of Locus Ingredients (then known as Locus Performance Ingredients).

8.      On September 15, 2022, Staub and Locus entered into a new Employment Agreement which specifically superseded and terminated any prior agreements between the parties. *See* Exhibit A at Section 22.

Ex. 1

9.     The Employment Agreement has a term of three (3) years effective from September 15, 2022. *See id*. at Section 2.

10.    The Employment Agreement provides that Locus will pay Staub an annual base salary of $350,000 and an annual bonus of up to 50% of the base salary. *See id*. at Sections 3 and 4.

11.    The Employment Agreement specifies that Locus can terminate Staub's employment at any time Without Cause, which is defined as termination for any reason other than termination for Cause, death, or Disability. *See id.* at Section 6(d).

12.    In the event Staub is terminated Without Cause, the Employment Agreement provides that Locus will pay Staub: an amount equal to 1 year of base salary, an amount equal to any annual bonus Staub would have received, and the employer's share of group health coverage continuation under COBRA for 1 year (the "severance benefits"). *See id.* at Section 7(c).

13.    The Employment Agreement further provides that Staub must execute and deliver a general release of claims in substantially the same form as Exhibit A to the Employment Agreement in order to receive the severance benefits. See *id.* at Section 9.

14.    Staub performed his duties under the Employment Agreement as CEO of Locus Ingredients.

15.    On October 10, 2023, Locus informed Staub that the Richmond lab was being shut down and his employment would end effective October 13, 2023.

16.    On October 11 and 19, 2023, Staub, through counsel, made demand for his contractual severance benefits pursuant to Section 7(c) of the Employment Agreement.

17.    On October 24, 2023, Staub timely elected and opted-in to COBRA benefits.

Ex. 1

18.     On November 2, 2023, Staub executed and delivered a general of claims to Locus that specifically reserved his rights to the contractual severance benefits.

19.     To date, Locus has refused to pay Staub his contractual severance benefits and has denied its contractual obligation to Staub.

### COUNT I
### Breach of Contract

20.     Staub and Locus entered into an Employment Agreement effective September 15, 2022.

21.     Staub was employed by Locus and performed his duties as CEO of Locus Ingredients.

22.     Locus terminated Staub's employment Without Cause effective October 13, 2023.

23.     Thereafter, Staub made a timely election of COBRA benefits and executed and delivered a general release of claims to Locus, while reserving his right to severance benefits.

24.     Pursuant to Section 7(c) of the Employment Agreement, Locus is obligated to pay Staub an amount equal to 1 year of base salary, an amount equal to any annual bonus Staub would have received, and the employer's share of group health coverage continuation under COBRA for 1 year.

25.     To date, despite demand for payment under Section 7(c) of the Employment Agreement, Locus has refused to pay Staub his contractual severance benefits.

26.     Staub has suffered damages in the form of unpaid contractual severance benefits.

WHEREFORE Claimant Timothy G. Staub respectfully demands entry of an arbitration award against Respondents Locus Management, LLC and Locus Ingredients, a wholly owned subsidiary of Locus Solutions, LLC for the following:

A.      An amount equal to 1 year of base salary ($350,000)

4

B.    An amount equal to his annual bonus ($175,000)

C.    An amount equal to 1 year of COBRA coverage ($20,676)

D.    Pre-judgment interest on the amounts due and owing

E.    Any other relief the arbitrator may deem appropriate.

Respectfully submitted,

TIMOTHY G. STAUB

By: */s/ Paul M. Falabella*_____
Harris D. Butler, III Esq.
Paul M. Falabella, Esq.
Butler Curwood, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
T: (804) 648-4848
F: (804) 237-0413
E-Mail: harris@butlercurwood.com
        paul@butlercurwood.com

*Counsel for Claimant*

5

Ex. 1

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November 2023, the foregoing was e-mailed and mailed, postage prepaid, to the following:

Michele Smolin, Esq.
General Counsel
Lauren Hutton,
HR Manager
Locus Management, LLC
Locus Solutions, LLC
30600 Aurora Road, Suite 180
Solon, OH 44139
msmolin@locusfs.com
lhutton@locusfs.com

*/s/ Paul M. Falabella___*

Ex. 1

# EXHIBIT A

*Execution Version*

## LOCUS MANAGEMENT, LLC

### <u>EMPLOYMENT AGREEMENT</u>

**EMPLOYMENT AGREEMENT** (this "<u>Agreement</u>") dated as of **September 15, 2022** (the "<u>Effective Date</u>"), between Locus Management, LLC, an Ohio limited liability company (the "<u>Company</u>"), and **Timothy G. Staub** (the "<u>Employee</u>").

### W I T N E S S E T H

**WHEREAS,** the Company desires to employ Employee as the Chief Executive Officer of Locus Performance Ingredients ("<u>Locus PE</u>"), wholly owned subsidiaries of Locus Solutions, LLC ("<u>Locus</u>"); and

**WHEREAS,** the Company and Employee desire to enter into this Agreement as to the terms of Employee's employment with the Company and Locus PE.

**NOW, THEREFORE,** in consideration of the foregoing, of the mutual promises contained herein and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  **POSITION AND DUTIES.**

(a)  During the Employment Term (as defined in <u>Section 2</u> hereof), Employee shall serve as Chief Executive Officer (the "<u>CEO</u>") of Locus PE.  In this capacity, Employee shall have the duties, authorities and responsibilities commensurate with the duties, authorities and responsibilities of persons in similar capacities in similarly sized companies with similarly situated business focuses. Employee shall report to the Chief Operating Officer (the "<u>COO</u>") of Locus; <u>provided</u>, that Employee may not be terminated, nor may Employee's duties, authorities and responsibilities be materially changed without the consent of the CEO of Locus, so long as Andy Lefkowitz is CEO of Locus, and thereafter, by the majority of the board of managers of Locus. Employee's principal place of employment with the Company shall be in Richmond, Virginia, <u>provided</u>, that Employee understands and Employee agrees that Employee may be required to travel from time to time for business purposes.

(b)  During the Employment Term, Employee shall devote all of Employee's business time, energy, business judgment, knowledge and skill and Employee's best efforts to the performance of Employee's duties with the Company; <u>provided</u> that the foregoing shall not prevent Employee from (i) serving on the boards of directors of non-profit organizations and, with the prior written approval of the board of managers of the Company (the "<u>Board</u>"), other than for profit companies, (ii) participating in charitable, civic, educational, professional, community or industry affairs, and (iii) managing Employee's passive personal investments so long as such activities in the aggregate do not interfere or conflict with Employee's duties hereunder or create a potential business or fiduciary conflict, <u>provided</u>, <u>further</u>, that nothing herein shall prohibit Employee from being a passive owner of not more than one percent (1%) of the outstanding stock of any class of a publicly traded corporation, so long as Employee does not actively participate in the business of such corporation.

1

**2.     EMPLOYMENT TERM.**  The Company agrees to employ Employee pursuant to the terms of this Agreement, and Employee agrees to be so employed, for a term of three (3) years (the "Initial Term") commencing on the Effective Date.  On the expiration of the Initial Term and on each annual anniversary of the Effective Date following the Initial Term, the term of this Agreement shall be automatically extended for successive one year periods; provided, that either party hereto may elect not to extend this Agreement by giving written notice to the other party at least thirty (30) days prior to such anniversary date ("Non-Extension"); provided, further, if there is a Non-Extension of this Agreement by the Company, then Employee's employment hereunder shall be deemed terminated by the Company without Cause on the last day of the Employment Term. Notwithstanding the foregoing, Employee's employment hereunder may be earlier terminated in accordance with Section 6 hereof.  The period of time between the Effective Date and the termination of Employee's employment hereunder shall be referred to herein as the "Employment Term."

**3.     BASE SALARY.**  The Company agrees to pay Employee a base salary at an annual rate of $350,000 (the "Base Salary"), payable in accordance with the regular payroll practices of the Company, but not less frequently than monthly.  Employee's Base Salary shall be subject to annual review by the CEO and COO of Locus and be approved by the Board, or a committee thereof, and may be increased from time to time in the Board's sole discretion.  Notwithstanding the foregoing, Employee's Base Salary may be decreased in connection with an across-the-board reduction of base salaries for similarly situated executives.

**4.     ANNUAL BONUS.**  For each calendar year during the Employment Term, Employee shall be eligible to receive an annual incentive payment of up to 50% of Base Salary (the "Annual Bonus") based on a full calendar year and the attainment of one or more pre-established performance targets or goals established by the Board (or a committee thereof). Except as otherwise provided in Section 7(c) herein, Employee must be employed by the Company on, and have not given notice of resignation prior to, the date of payment. The Annual Bonus, if any, less applicable withholding, will be paid as soon as practicable after the delivery of the Company's audited financial statements for the calendar year for which the Annual Bonus is payable; provided, that if the Company's audited financial statements are not delivered by April 1 of the calendar year immediately following the calendar year for which the Annual Bonus is payable, then the Company shall pay Employee eighty-percent (80%) of the projected Annual Bonus (as determined in the Board's sole discretion) on the Company's first payroll date following April 1 (the "Initial Bonus Payment"), and the remaining portion of such projected Annual Bonus shall be paid within thirty (30) days following the date that the Company's audited financial statements are actually delivered (the "Final Bonus Payment", and together with the Initial Bonus Payment, the "Bonus Payments"), but in no event later than the end of the calendar year immediately following the calendar year for which the Annual Bonus is payable.

**5.     EMPLOYEE BENEFITS.**

(a)     **BENEFIT PLANS.**  During the Employment Term, Employee shall be entitled to participate in any employee benefit plan that the Company has adopted or may adopt, maintain or contribute to for the benefit of its employees generally, subject to satisfying the applicable eligibility requirements, except to the extent such plans are duplicative of the benefits otherwise provided hereunder.  Employee's participation will be subject to the terms of the applicable plan

Ex. 1

documents and generally applicable Company policies.  Notwithstanding the foregoing, the Company, in its sole discretion, may amend, modify or terminate any employee benefit plan at any time, to the extent permitted by applicable law, and so long as such amendments, modifications or termination affects similarly situated executives.

(b)  **VACATIONS.**  During the Employment Term, Employee shall be entitled to accrued paid time off ("PTO") at the rate of 7.96 hours per pay period effective on Employee's start date (which is equal to twenty-five (25) days of PTO over the course of twelve (12) months). Following the first anniversary of Employee's start date, the PTO shall immediately vest for the coming year, and any accrued, but unused PTO in any such year will be forfeited.  If Employee's employment with the Company is terminated for any reason, Employee shall forfeit any accrued, but unused PTO.

(c)  **BUSINESS EXPENSES.**  Upon presentation of reasonable substantiation and documentation as the Company may specify from time to time, Employee shall be reimbursed in accordance with the Company's expense reimbursement policy, for all reasonable out-of-pocket business expenses incurred and paid by Employee in connection with the performance of Employee's duties hereunder.

6.  **TERMINATION.**  Employee's employment shall terminate on the first of the following to occur:

(a)  **DISABILITY.**  Upon ten (10) days' prior written notice by the Company to Employee of termination due to Disability.  For purposes of this Agreement, Employee shall be deemed to have a "Disability" if he or she is considered disabled under the Company's group long-term disability plan.  If the Company does not maintain a group long-term disability plan, "Disability" shall be defined as the inability of Employee to have performed Employee's material duties hereunder due to a physical or mental injury, infirmity or incapacity for one hundred eighty (180) days (including weekends and holidays) in any 365-day period as determined by the Board in its reasonable discretion. Notwithstanding the foregoing, any determination of Disability which is contested by Employee shall be subject to review by a mutually agreed upon qualified medical professional.

(b)  **DEATH.**  Automatically and immediately upon the date of death of Employee.

(c)  **CAUSE.**  The Board shall give Employee written notice stating with reasonable specificity the nature of the circumstances determined in good faith to constitute Employee's termination for Cause, "Cause" shall mean Employee's:

(i)  indictment for, conviction by a court of competent jurisdiction of, or a plea of *nolo contendere* of a felony, or to any crime involving fraud or moral turpitude;

(ii)  commission at any time of any act of fraud, embezzlement, misappropriation, gross neglect, or breach of fiduciary duty against the Company or any of its parent, subsidiary, or affiliate entities;

(iii)  breach of any of the Company's material written policies, including without limitation, its material policies prohibiting harassment (sexual or otherwise) and discrimination,

3

Ex. 1

material policies against sexual relationships within the Company, and its material policies regarding equal employment opportunity;

       (iv)    breach of any material obligation of the Restrictive Covenants (as defined below) owed to the Company or any affiliate of the Company, or a material breach of any other existing agreement between Employee and the Company that is not cured within fifteen (15) days after written notice from the Company of such failure (to the extent such failure is curable, to be determined at the Company's reasonable discretion); or

       (v)    habitual or repeated neglect by Employee to perform Employee's job duties and responsibilities to the Company, which failure is not cured in all respects within fifteen (15) days after written notice from the Company of such failure (to the extent such failure is curable, to be determined at the Company's reasonable discretion).

    (d)    **WITHOUT CAUSE.**  Employee is terminated by the Company for any reason other than termination for Cause, death or Disability.

    (e)    **GOOD REASON.**  Upon written notice by Employee, Employee's voluntary termination of employment from the Company for Good Reason. "Good Reason" shall mean the occurrence of any of the following events, without the express written consent of Employee, unless such events are fully corrected in all material respects by the Company within thirty (30) days following written notification by Employee to the Company of the occurrence of one of the reasons set forth below:

       (i)    a material diminution in Employee's title, duties, authorities or responsibilities (other than temporarily while physically or mentally incapacitated or as required by applicable law);

       (ii)    a material breach by the Company of this Agreement;

       (iii)    a material diminution in Employee's Base Salary (other than a reduction permitted under Section 3 hereof); provided that such reduction under Section 3 lasts less than twelve (12) months and is in connection with an across-the-board material diminution of salaries for similarly situated executives; or

       (iv)    a relocation of Employee's principal place of employment (or place of residence if Employee exclusively works remotely) of more than fifty (50) miles (excluding regular travel in the ordinary course of business).

    Employee shall provide the Company with written notice detailing the specific circumstances alleged to constitute Good Reason within ninety (90) days after the Employee becomes aware of the first occurrence of such circumstances, and Employee actually terminates employment within thirty (30) days following the expiration of the Company's thirty (30)-day cure period described above. Otherwise, any claim of such circumstances as "Good Reason" shall be deemed irrevocably waived by Employee.

    (f)    **WITHOUT GOOD REASON.**  Upon thirty (30) days' prior written notice by Employee to the Company of Employee's voluntary termination of employment without Good

4


Ex. 1

Reason (which the Company may, in its sole discretion, make effective earlier than the thirtieth (30th) day after the notice date).

(g)   **NON-EXTENSION OF AGREEMENT**. Upon the expiration of the Employment Term due to a Non-Extension of this Agreement by the Company or Employee pursuant to the provisions of Section 2 hereof.

**7.   CONSEQUENCES OF TERMINATION.**

(a)   **TERMINATION FOR CAUSE.** If Employee's employment is terminated during the Employment Term by the Company for Cause, the Company shall pay to Employee any unpaid Base Salary earned through the date of termination (the "Termination Date"), reimbursement for any unreimbursed business expenses incurred through the date of termination, and any vested benefits payable to Employee pursuant to the terms of any applicable benefit or compensation plan (collectively, the "Accrued Benefits").

(b)   **TERMINATION UPON DEATH, OR RESIGNATION WITHOUT GOOD REASON.** If Employee's employment is terminated during the Employment Term by reason of death or by the Employee without Good Reason, the Company shall pay to Employee (or Employee's estate, as applicable) the Accrued Benefits and an amount equal to any Annual Bonus that would have been paid with respect to the calendar year immediately preceding the year that includes the Termination Date (to the extent not previously paid).

(c)   **TERMINATION WITHOUT CAUSE, OR DUE TO DISABILITY, OR NON-EXTENSION BY THE COMPANY, OR RESIGNATION FOR GOOD REASON.** If Employee's employment is terminated during the Employment Term (i) by the Company other than for Cause (and for the sake of clarity, other than as a result of Employee's death), (ii) by reason of Disability, (iii) due to Non-Extension of the Employment Term pursuant to Section 2 of this Agreement, or (iv) by Employee for Good Reason, the Company shall pay or provide Employee with the following:

(i)   the Accrued Benefits;

(ii)   an amount equal to 1 year of Employee's Base Salary then in effect on the Termination Date (such amount, the "Severance Amount"). The Severance Amount shall be paid as salary continuation in accordance with the Company's standard payroll practices beginning on the Termination Date; provided, that any such payment scheduled to occur during the first sixty (60) days following the Termination Date shall not be paid until, and shall instead be paid on, the sixtieth (60th) day following the Termination Date and shall include payment of any amount that would otherwise have been scheduled to be paid prior thereto but for this provision;

(iii)   at the sole discretion of the Board, an amount equal to any Annual Bonus that would have been paid with respect to the calendar year immediately preceding the year that includes the Termination Date (to the extent not previously paid), to be paid at the same time as the Annual Bonus is paid to similarly situated executives; and

(iv)   subject to Employee's timely election of COBRA continued coverage under a Company group health plan, the Company will continue to pay the same employer share of the



Ex. 1

cost for group health coverage continuation under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") as paid for active employees with similar coverage for 1 year or, if earlier, until Employee becomes eligible for group health benefits from another employer (the "COBRA Benefits"); provided, however, if the Company determines, in its sole discretion, that in the event the COBRA Benefits would cause Employee to be taxed on the reimbursements from the Company's group health plan or cause the Company's health plan to fail nondiscrimination testing under Section 105 of the Internal Revenue Code, the Company shall cause the value of such COBRA Benefits to be imputed in the income of Employee or the Company shall take such other reasonable actions as appropriate to avoid Employee becoming taxed on such reimbursements and in the event the Company cannot pay for the COBRA Benefits without potentially incurring an excise tax or penalties under applicable law, the Company shall not be required to pay the COBRA Benefits. Employee agrees (A) at any time either before or during the period of time Employee is receiving COBRA Benefits, to inform the Company promptly in writing if Employee becomes eligible to receive group health coverage from another employer; and (B) that Employee may not increase the number of designated dependents, if any, following the Termination date unless Employee does so at Employee's own expense. For purposes of clarity, such period during which Employee received COBRA Benefits shall run concurrent with COBRA. Notwithstanding anything to the contrary herein this clause (iv), if the Employee becomes eligible for Medicare, the Company paid COBRA Benefits shall switch to Medicare supplement coverage for the remainder of the twelve (12) months when the Employee timely registers for Medicare; provided, that once Employee enrolls in Medicare while receiving the Company paid COBRA Benefits, then the Employee will lose the Company paid COBRA Benefits upon Medicare enrollment.

(v)     Notwithstanding the foregoing, any amounts payable by the Company in paragraphs (ii)(a) through (iv) under this Section 7(c) herein, shall be subject to Employee's continued compliance in all material respects with the obligations in Sections 9 through 11 hereof and subject to the release described in Section 9 becoming effective and irrevocable within sixty (60) days of the Termination Date.

Payments and benefits provided in this Section 7(c) shall be in lieu of any termination or severance payments or benefits for which Employee may be eligible under any of the plans, policies or programs of the Company or under the Worker Adjustment Retraining Notification Act of 1988 or any similar state statute or regulation.

(d)     **OTHER OBLIGATIONS.** Upon any termination of Employee's employment with the Company, Employee agrees that Employee shall be deemed to have resigned from any position as an officer, director or fiduciary of the Company or any Company-related entity on the Termination Date, and Employee understands that such resignation shall not require notice to, or consent from, the Employee; provided, to the extent necessary, Employee shall cooperate and execute any necessary documentation to effectuate Employee's resignation from any other position.

(e)     **EXCLUSIVE REMEDY.** The amounts payable to Employee following termination of employment and the Employment Term hereunder this Section 7 shall be in full and complete satisfaction of Employee's rights under this Agreement and any other claims that Employee may have in respect of Employee's employment with the Company or any of its

6

Ex. 1

affiliates, and Employee acknowledges that such amounts are fair and reasonable, and are Employee's sole and exclusive remedy, in lieu of all other remedies at law or in equity, with respect to the termination of Employee's employment hereunder or any breach of this Agreement.

8.     Reserved.

9.     **RELEASE; NO MITIGATION.**  Any and all amounts payable and benefits or additional rights provided pursuant to Section 7(c) of this Agreement shall only be payable if Employee delivers to the Company and does not revoke a general release of claims in favor of the Company in substantially the form attached on Exhibit A hereto.  Such release shall be executed and delivered (and no longer subject to revocation, if applicable) within thirty (30) days following the Termination Date.

10.    **RESTRICTIVE COVENANTS.** In connection to Employee's employment with the Company, Employee will be required to execute certain documentation, including a Non-Competition, Non-Solicitation, and Confidentiality Agreement (collectively, the "Restrictive Covenants"), attached hereto as Exhibit B.

11.    **COOPERATION.**

(a)    Upon the receipt of reasonable notice from the Company (including outside counsel), Employee agrees that while employed by the Company and for five (5) years thereafter, Employee will respond and provide information with regard to matters in which Employee has knowledge as a result of Employee's employment with the Company, and will provide reasonable assistance to the Company, its affiliates and their respective representatives in defense of any claims that may be made against the Company or its affiliates, and will assist the Company and its affiliates in the prosecution of any claims that may be made by the Company or its affiliates, to the extent that such claims may relate to the period of Employee's employment with the Company (collectively, the "Claims").  Employee agrees to promptly inform the Company if Employee becomes aware of any lawsuits involving Claims that may be filed or threatened against the Company or its affiliates.  Employee also agrees to promptly inform the Company (to the extent that Employee is legally permitted to do so) if Employee is asked to assist in any investigation of the Company or its affiliates (or their actions), or another party attempts to obtain information or documents from Employee (other than in connection with any litigation or other proceeding in which Employee is a party-in-opposition) with respect to matters Employee believes in good faith to relate to any investigation of the Company or its affiliates, in each case, regardless of whether a lawsuit or other proceeding has then been filed against the Company or its affiliates with respect to such investigation, and shall not do so unless legally required.  During the pendency of any litigation or other proceeding involving Claims, Employee shall not communicate with anyone (other than Employee's attorneys and tax and/or financial advisors and except to the extent that Employee determines in good faith is necessary in connection with the performance of Employee's duties hereunder) with respect to the facts or subject matter of any pending or potential litigation or regulatory or administrative proceeding involving the Company or any of its affiliates without giving prior written notice to the Company or the Company's counsel.

(b)    Notwithstanding anything to the contrary in Section 11(a) above, Employee agrees that while employed by the Company and thereafter, Employee shall execute all documents,



Ex. 1

instruments, applications, assignments, conveyance, or other documents, or furnish any information to the Company and take all such other appropriate lawful actions as the Company reasonably requests that are necessary to effectuate any business opportunities or transactions contemplated by the Company, or in connection with, any regulatory, or tax filings, or process, or any legal proceedings.

(c) Upon presentation of appropriate documentation, the Company shall pay or reimburse Employee for all reasonable out-of-pocket travel expenses (including meals and lodging) incurred by Employee in complying with this Section 11. The obligations contained in this Section 11 shall survive the termination or expiration of the Employment Term and Employee's employment with the Company and shall be fully enforceable thereafter. Any cooperation occurring pursuant to this Section 11 after the termination of Employee's employment shall be scheduled to the extent reasonably practicable so as not to unreasonably interfere with Employee's business or personal affairs. Reasonable cooperation shall not include cooperation to the extent such cooperation could or would relate to a potential claim of the Company against Employee or of Employee against the Company.

12. **NO ASSIGNMENTS; SUCCESSORS.** This Agreement is personal to each of the parties hereto. Except as provided in this Section 12 hereof, no party may assign or delegate any rights or obligations hereunder without first obtaining the written consent of the other party hereto, except that the Company may transfer or assign its rights or obligations under this Agreement without prior written consent of Employee, in whole or in part, to (a) one or more of its affiliates (including, but not limited Locus), or (b) to any successor of the Company or any of its affiliates (including by way or merger, consolidation, reorganization, or sale); provided, that the Company shall require such successor to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. Any purported assignment, delegation or other transfer in violation of this Section 12 shall be null and void.

13. **NOTICE.** For purposes of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of delivery, if delivered by hand, (b) on the date of transmission, if delivered by electronic mail, (c) on the first business day following the date of deposit, if delivered by guaranteed overnight delivery service, or (d) on the fourth (4th) business day following the date delivered or mailed by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to Employee:

At the address shown in the books and records of the Company.

If to the Company:

Locus Management, LLC
30600 Aurora Road, Suite 180
Solon, OH 44139

Ex. 1

Attention: Human Resources

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

**14.    SECTION HEADINGS; INCONSISTENCY.**  The section headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement.  In the event of any inconsistency between the terms of this Agreement and any form, award, plan or policy of the Company, the terms of this Agreement shall govern and control.

**15.    SEVERABILITY.**  The provisions of this Agreement shall be deemed severable. The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by applicable law.

**16.    COUNTERPARTS.**  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.  Further, this Agreement may be executed by transfer of an originally signed document by e-mail or other electronic means, any of which will be as fully binding as an original document.

**17.    CONSENT TO ARBITRATE.**  In consideration of the Company employing Employee and the wages and benefits provided in this Agreement, Employee and the Company each agree that all claims arising out of or relating to Employee's employment, including its termination, shall be resolved by binding arbitration in Cuyahoga County, Ohio; provided, however, that the Company shall be entitled to seek a restraining order or injunction in any court of competent jurisdiction to prevent any continuation of any violation of the provisions of any Restrictive Covenants as required to be executed pursuant to Section 10 of this Agreement and Employee hereby consents that such restraining order or injunction may be granted without the necessity of the Company's posting any bond or other security interests; provided further, that Employee shall be entitled to seek specific performance of Employee's right to be paid until the Termination Date during the pendency of any dispute or controversy arising under or in connection with this Agreement.  The dispute will be arbitrated in accordance with JAMS Employment Arbitration Rules & Procedures before a single JAMS arbitrator. The parties agree to bear their own attorneys' fees, costs and expenses in connection with the arbitration in accordance with applicable law.  However, if any party prevails on a statutory claim which affords the prevailing party attorneys' fees, the arbitrator may award reasonable fees and costs to the prevailing party, under the standards for an award of fees provided by law.  The parties shall equally share the arbitrator's fees and costs. After receipt of the arbitrator's estimated bill for services at commencement of arbitration, both parties shall deposit the apportioned amount into an account specified at such time.  The parties agree to file any demand for arbitration within the time limit established by the applicable statute of limitations for the asserted claims or within one year of knowledge of the conduct that forms the basis of the claim if no statutory limitation is applicable.  Failure to demand arbitration within the prescribed time period shall result in waiver

9

Ex. 1

of said claims. Any decision and findings of the arbitrator shall be final and binding on the parties and held confidential by the parties, and the parties agree to execute all documents necessary to maintain such confidentiality.  The remedies available in the arbitration proceeding shall be the same as those that are available by law with respect to the claims raised in the dispute giving rise to arbitration. This Section 17 will cover all matters directly or indirectly related to Employee's recruitment, hiring, employment with or termination from the Company, except as expressly set forth herein as relates to the parties' ability to seek injunctive relief in a court of competent jurisdiction. THE PARTIES UNDERSTAND AND AGREE THAT THEY ARE WAIVING THEIR RIGHTS TO BRING SUCH CLAIMS IN COURT, INCLUDING THE RIGHT TO A JURY TRIAL. THE PARTIES ALSO AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN THEIR INDIVIDUAL CAPACITIES, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE OR COLLECTIVE PROCEEDING.

**18.** **WAIVER OF JURY TRIAL.** EMPLOYEE HEREBY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR EMPLOYEE'S EMPLOYMENT BY THE COMPANY OR ANY AFFILIATE OF THE COMPANY, OR EMPLOYEE'S OR THE COMPANY'S PERFORMANCE UNDER, OR THE ENFORCEMENT OF, THIS AGREEMENT.

**19.** **GOVERNING LAW**. This Agreement, the rights and obligations of the parties hereto, and any claims or disputes relating thereto, shall be governed by and construed in accordance with the laws of the State of Ohio (without regard to its choice of law provisions).

**20.** **JURISDICTION; VENUE**. Each of the parties hereto by its execution hereof:

(a)     irrevocably submits to the jurisdiction of any State or federal court located in Cuyahoga County, Ohio for the purpose of any suit, action or other proceeding arising out of or based on this Agreement or the subject matter hereof, and agrees that any such court will be deemed to be a convenient forum; and

(b)     waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such proceeding brought in any of the above-named courts, any claim that it is not subject personally to the jurisdiction of such courts, that its property is exempt or immune from attachment or execution, that any such proceeding is brought in an inconvenient forum, that the venue of such proceeding is improper, or that this Agreement, or the subject matter hereof, may not be enforced in or by such court.

(c)     The parties hereto hereby consent to service of process in any such proceeding in any manner permitted by the laws of Ohio, and agree that service of process by registered or certified mail, return receipt requested, at its address specified in or pursuant to this Agreement is reasonably calculated to give actual notice.

**21.** **WAIVER MODIFICATION.** No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by Employee and such officer or director as may be designated by the Board.  No waiver

Ex. 1

by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

22.     **ENTIRE AGREEMENT; TERMINATION OF PRIOR AGREEMENTS.** By signing this Agreement, Employee agrees that this Agreement, together with all exhibits hereto, constitutes the entire agreement between the Company and Employee in respect of the subject matter contained herein and terminates and supersedes, in their entirety, any and all prior representations, undertakings, agreements, or understandings (whether oral or written and whether expressed or implied), and specifically supersedes any severance and/or equity grant provisions of any offer letter, employment agreement, or equity award agreement entered into between Employee and the Company prior to the Effective Date hereof.

23.     **SURVIVAL OF OPERATIVE SECTIONS**.    Upon any termination of Employee's employment, the provisions of this Agreement (together with any related definitions set forth in herein) shall survive to the extent necessary to give effect to the provisions thereof.

24.     **REPRESENTATIONS.** Employee represents and warrants to the Company that (a) Employee has the legal right to enter into this Agreement and to perform all of the obligations on Employee's part to be performed hereunder in accordance with its terms, and (b) Employee is not a party to any agreement or understanding, written or oral, and is not subject to any restriction, which, in either case, could prevent Employee from entering into this Agreement or performing all of Employee's duties and obligations hereunder.

25.     **TAX MATTERS.**

(a)     **WITHHOLDING.**    The Company may withhold from any and all amounts payable under this Agreement or otherwise such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(b)     **SECTION 409A COMPLIANCE.**

(i)     The intent of the parties is that payments and benefits under this Agreement comply with Internal Revenue Code Section 409A and the regulations and guidance promulgated thereunder (collectively "Code Section 409A") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith. To the extent that any provision hereof is modified in order to comply with Code Section 409A, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to Employee and the Company of the applicable provision without violating the provisions of Code Section 409A. In no event whatsoever shall the Company be liable for any additional tax, interest or penalty that may be imposed on Employee by Code Section 409A or damages for failing to comply with Code Section 409A.

(ii)     A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this

11

Ex. 1

Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service."  Notwithstanding anything to the contrary in this Agreement, if Employee is deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment or the provision of any benefit that is considered deferred compensation under Code Section 409A payable on account of a "separation from service," such payment or benefit shall not be made or provided until the date which is the earlier of (A) the expiration of the six (6)-month period measured from the date of such "separation from service" of Employee, and (B) the date of Employee's death, to the extent required under Code Section 409A.  Upon the expiration of the foregoing delay period, all payments and benefits delayed pursuant to this Section 25(b)(ii) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Employee in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

        (iii)    To the extent that reimbursements or other in-kind benefits under this Agreement constitute "nonqualified deferred compensation" for purposes of Code Section 409A, (A) all expenses or other reimbursements hereunder shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by Employee, (B) any right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (C) no such reimbursement, expenses eligible for reimbursement, or in-kind benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year.

        (iv)    For purposes of Code Section 409A, Employee's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.  Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company provided that where such period spans two calendar years, no payment of any severance amount or benefit that is (i) considered to be nonqualified deferred compensation within the meaning of Code §409A and (ii) conditioned upon a general release of claims shall be made before the first day of the second (2nd) calendar year, regardless of when the release is actually executed and returned to the Company.

        (v)    Notwithstanding any other provision of this Agreement to the contrary, in no event shall any payment under this Agreement that constitutes "nonqualified deferred compensation" for purposes of Code Section 409A be subject to offset by any other amount unless otherwise permitted by Code Section 409A.

**26.**    **SECTION 280G.**  Notwithstanding anything in this Agreement to the contrary, if any amount or benefit to be paid or provided under this Agreement would be an "Excess Parachute Payment," within the meaning of Section 280G of the Code but for the application of this sentence, then the payments and benefits to be paid or provided will be reduced to the minimum extent necessary (but in no event to less than zero) so that no portion of any such payment or benefit, as so reduced, constitutes an Excess Parachute Payment; provided, however, that the foregoing reduction will be made only if and to the extent that such reduction would result in an increase in the aggregate payment and benefits to be provided, determined on an after-tax basis (taking into

Ex. 1

account the excise tax imposed pursuant to Section 4999 of the Code, any tax imposed by any comparable provision of state law , and any applicable federal, state and local income and employment taxes).   Unless the Company and Employee otherwise agree in writing, any determination required under this <u>Section 26</u> shall be made in writing by the Company's independent public accountants (the "<u>Accountants</u>"), whose determination shall be conclusive and binding upon Employee and the Company for all purposes.   For purposes of making the calculations required by this <u>Section 26</u>, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Section 280G and 4999 of the Code. The Company and Employee shall furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this <u>Section 26</u>. If a reduction of total payments is required in accordance with this <u>Section 26</u>, then the order of reduction and items which are being reduced will be as follows: (a) a portion of the payments or benefits which are not paid in cash; (b) cash payments; and (c) the payments (whether payable in cash or not payable in cash) to which Treasury Regulation § 1.280G-1 Q/A 24(c) (or successor thereto) applies. Within any such category of payments and benefits (that is, within clause (a), (b) or (c)), a reduction shall occur first with respect to amounts that do not constitute "nonqualified deferred compensation" within the meaning of Code Section 409A and then with respect to amounts that constitute nonqualified deferred compensation for such purposes. To the extent any such payment is to be made over time (e.g., cash severance benefits payable in installments), then the payments shall be waived in reverse chronological order. Notwithstanding the foregoing language of this paragraph, if anything regarding the order of reduction or elimination would violate Code Section 409A, then the reduction or elimination shall be made pro rata among the payments or benefits otherwise due or payable (on the basis of the relative present value of the parachute payments). The Company shall bear all costs the Accountant may reasonably incur in connection with any calculations contemplated by this <u>Section 26</u>.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Ex.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

COMPANY

By:_____

Name: <u>Andrew Lefkowitz</u>

Title: <u>CEO</u>

-

**EMPLOYEE**

_____

Timothy G. Staub

14

Ex. 1